IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PEGGY PIERCE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO.  4:18-cv-01686 |
| | § | |
| FONDREN ORTHOPEDIC GROUP LLP and | § | |
| FONDREN ORTHOPEDIC LTD, | § | |
| | § | |
| Defendants | | |

## PIERCE'S MOTION FOR PARTIAL SUMMARY
## JUDGMENT ON TWO OF HER BREACH OF CONTRACT CLAIMS

OBERTI SULLIVAN LLP

By:    s/ Mark J. Oberti
Mark J. Oberti
State Bar No. 00789951
S.D. Texas No. 17918
712 Main Street, Suite 900
Houston, Texas 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
mark@osattorneys.com – Email

Attorney-in-Charge For Plaintiff

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email

ATTORNEYS FOR PLAINTIFF

i

## TABLE OF CONTENTS

I.     SUMMARY .................................................................................................1

II.    FACTUAL BACKGROUND ........................................................................3

    A.    Pierce Was Instrumental In FOG's Exponential Growth Over More Than
         A Quarter Of A Century, And In Making Its Physician Partners
         Millionaires Many Times Over ............................................................3

    B.    Pierce Had An Approximately $630,000 Per Year Compensation Package;
         In Addition, In 2014, FOLTD Agreed To Pay Her Approximately
         $300,000.00 Per Year For Five Years After Her Employment With FOG
         Ended .......................................................................................5

    C.    Pierce Objected To FOG's Unethical Practices; In Response, FOG
         Illegally Removed Pierce From The Workplace And Placed Her On An
         "Indefinite Leave" Based On Her Disability, Age, And Sex ................7

    D.    Dr. Elkousy Essentially Admitted That FOG's Given Reason For
         Removing Pierce From The Workplace And Placing Her On An
         "Indefinite Leave" Was A Pretext .....................................................10

    E.    Pierce Alleged Illegal Discrimination, And Defendants Hired A Law Firm
         To Investigate Her Allegations While She Remained On The Indefinite
         Leave .........................................................................................10

    F.    While She Remained On Her "Indefinite Leave," Pierce Filed An
         EEOC/TWC-CRD Charge Of Discrimination, And Sent A Copy Of The
         Charge To Defendants' Lawyer .........................................................11

    G.    Two Weeks After She Filed Her EEOC/TWC-CRD, FOG Fired Pierce,
         But Did Not Allege That It Had Fired Her For Cause, Or For Any
         Particular Alleged Wrongdoing – In Fact, It Thanked Pierce For Her
         Service And Wished Her The Best In Her Future Endeavors ..............11

    H.    Defendants Fired Their First Law Firm, And Hired A New Law Firm ...............12

    I.    Defendants Then Belatedly Claimed That They Fired Pierce For Cause, In
         A Desperate Attempt To Get Out Of Paying Pierce Approximately $1.5
         Million Under The Agreement It Entered With Her In November 2014 ...........12

III.    SUMMARY JUDGMENT STANDARD .......................................................13

IV.    ARGUMENT AND ANALYSIS ..................................................................13

    A.    Legal Standards ...............................................................................13

B.     Analysis ................................................................................................ 14

    1.    The Agreement Is Supported By Consideration ...................................... 14

    2.    There Is No Exception In The Agreement For A Termination For Cause (And Pierce Was Not Terminated For Cause Anyway) ................ 15

V.    CONCLUSION .......................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Bodenheimer v. PPG Indus., Inc.*,
  5 F.3d 955 (5th Cir. 1993) ................................................................................................ 13

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................................... 13

*City of Houston v. Williams*,
  353 S.W.3d 128 (Tex. 2011) .............................................................................................. 15

*Coleman v. Hous. Indep. Sch. Dist.*,
  113 F.3d 528 (5th Cir. 1997) ............................................................................................. 13

*David J. Sacks, P.C. v. Haden*,
  266 S.W.3d 447 (Tex. 2008) .............................................................................................. 14

*Diamond Paint Co. of Houston v. Embry*,
  525 S.W.2d 529 (Tex. Civ. App. – Houston (14th Dist.) 1975, writ refused n.r.e.) ................. 14

*Frost Nat'l Bank v. L & F Distribs., Ltd.*,
  165 S.W.3d 310 (Tex. 2005) .............................................................................................. 14

*Gorbet v. Northwood Lincoln-Mercury*,
  No. 14-04-00813-CV, 2005 WL 2875283 (Tex. App. – Houston [14th Dist.] 2005, writ
  denied) ................................................................................................................................ 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ........................................................................................................... 13

*Pasant v. Jackson Nat'l Life Ins. Co.*,
  52 F.3d 94 (5th Cir. 1995) ................................................................................................. 15

*Richardson v. Office Bldgs. of Houston*,
  704 S.W.2d 373 (Tex. App. – Houston [14th] Dist. 1985, no writ) ....................................... 14

*Toch v. Eric Schuster Corp.*,
  490 S.W.2d 618 (Tex. Civ. App.–Dallas 1972, writ ref'd n.r.e.) ........................................... 15

*Transcon. Gas Pipeline Corp. v. Texaco, Inc.*,
  35 S.W.3d 658 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ...................................... 14

*Vanegas v. American Energy Services*,
  302 S.W.3d 299 (Tex. 2009) .............................................................................................. 15

*Winters v. Langdeau,*
   360 S.W.2d 515 (Tex. 1962) ...................................................................14

*Wright v. Christian & Smith,*
   950 S.W.2d 411 (Tex. App.–Houston [1st Dist.] 1997, no writ)............................................14

**STATUTES**

18 U.S.C. § 1833(b) ...................................................................................9

**RULES**

Fed. R. Civ. P. 56(a) ...............................................................................13

Fed. R. Civ. P. 56(c) ...............................................................................13

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PEGGY PIERCE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO.  4:18-cv-01686 |
| | § | |
| FONDREN ORTHOPEDIC GROUP LLP and | § | |
| FONDREN ORTHOPEDIC LTD, | § | |
| | § | |
| Defendants | | |

## PIERCE'S MOTION FOR PARTIAL SUMMARY
## JUDGMENT ON TWO OF HER BREACH OF CONTRACT CLAIMS

Peggy Pierce ("Pierce") files this Motion for Partial Summary Judgment on Two of her Breach of Contract Claims.

## I.     SUMMARY

Pierce is the former Administrator and Chief Executive Officer ("CEO") of Defendant Fondren Orthopedic Group LLP ("FOG").  She was employed by FOG for nearly thirty years. Defendant Fondren Orthopedic LTD ("FOLTD") is a 40% owner of Texas Orthopedic Hospital ("TOH").  When TOH generates profits, the physician partners of FOLTD share them according to the number of "units" they own in FOLTD.

In 2014, FOLTD agreed in writing to pay Pierce the equivalent of 10 unit shares from FOLTD's quarterly partnership earnings during the rest of her employment with FOG, and for five years after her termination.  *See* "the Agreement," (Ex. 1-E) (underline added).  The Agreement does not condition Pierce's right to such payment for five years after her termination on her being terminated without cause.  The Agreement was conceived of, initiated by, and

1

executed on behalf of FOLTD by Dr. Woods, who was FOLTD's President.  Dr. Woods had both apparent and actual authority to execute the Agreement on behalf of FOLTD.

Over the years, the quarterly distributions averaged a total of approximately a total of $300,000.00 a year.  On March 15, 2018, FOG terminated Pierce (Ex. 1-L).  At the time, FOG did not claim Pierce had been fired for "cause."  (*Id.*).  However, on April 18, 2018, FOG and FOLTD took the position through their newly hired legal counsel that, despite the plain language of the Agreement to the contrary, Pierce was not entitled to be paid either: (1) her full final quarterly distribution for the first quarter of 2018 (which would have been approximately $63,139.32); or (2) any further quarterly distributions, much less five years worth of such distributions (Ex. 1-L).

At the time, FOG's and FOLTD's sole basis for taking these positions was that Pierce had allegedly been terminated for "cause."  (*Id.*).  Later, FOG and FOLTD claimed the Agreement was not supported by consideration (Defendants' Original Answer and Counterclaim, Doc. 8 at ¶ 45).  As a matter of law, these two grounds do not justify FOG's and FOLTD's positions because: (1) the plain and unambiguous language of the Agreement does not excuse FOLTD from performance if Pierce is terminated for "cause"; and (2) the Agreement is supported by adequate consideration.

Accordingly, Pierce seeks a summary judgment ruling that she is entitled to be paid by FOLTD: (1) her full final quarterly distribution for the first quarter of 2018 (which would have been approximately $63,139.32); and (2) the equivalent of 10 unit shares from FOLTD's quarterly partnership earnings for five years after her termination, *i.e.*, until the end of March 2023.

## II.     FACTUAL BACKGROUND[1]

### A.     Pierce Was Instrumental In FOG's Exponential Growth Over More Than A Quarter Of A Century, And In Making Its Physician Partners Millionaires Many Times Over

Pierce earned a Bachelor of Business Administration from the University of Houston in 1981, and is a Fellow in The American College of Medical Practice Executives.  Pierce joined FOG as its Chief Financial Officer in 1989, became its Administrator in 1993, and then successfully led the Company for two and one-half decades. Some of Pierce's accomplishments and contributions to FOG and FOLTD over the years, are as follows:

a. She grew the organization from its initial size of 14 physicians to over 50 physicians, and from one location to 16 locations.

b. She was instrumental in hiring top quality orthopedic surgeons for the last 20+ years.  As part of that, she handled all contract negotiations and financial matters.

c. She started the first Offshore Captive for Medical Malpractice insurance of FOG's size in 2001.  The savings have been approximately $18 million since inception.

d. She managed all construction projects for both the Texas Orthopedic Hospital ("TOH") – which FOLTD is a 40% owner – and FOG, including the initial building of TOH.  The total construction costs for the TOH were well in excess of $120 million, and the construction was finished on budget and on time.  TOH's majority owner is Hospital Corporation of America ("HCA"), a for-profit operator of health care facilities in the United States and United Kingdom.

e. She negotiated TOH's contract with DePuy Synthes Companies.  The savings for the hospital have been approximately $20 million.  In addition, she extended the contract for another five years before the contract expired.  The initial contract was negotiated with the President of Johnson & Johnson.

f. She recruited and brought on Drs. Uday Doctor and Michael McCann who collectively produce $120,000 annually for each 40-unit owning partner.

g. She successfully negotiated all major vendor contracts for both FOG and TOH for the last 29/25 years, respectively.

---

[1] The facts stated in this motion are supported by Pierce's sworn affidavit (attached as Exhibit 1) and the documents attached thereto as Exhibits 1-A through 1-O.

h.  She led negotiations for all major purchases for FOG and TOH including MRI equipment, PACS systems, operating room equipment, etc.

i.  Due largely to her efforts, FOG was successful in earning a substantial Medicare bonus of approximately 19.2%.  Only approximately 4% of groups in the country earned the bonus.

j.  She converted all semi-private rooms to private room, which required careful and detailed coordination.  She also added approximately 30 OBS beds for TOH.

k.  She initiated and executed the plan to increase the number of Operating Rooms to 17 prior to moratoria being put in place.  She also created plans to immediately add more are if the moratoria are lifted.

l.  She took a very creative approach in developing incredible banking terms for both FOG and TOH, and FOLTD new partners.

m.  She handled and managed all Risk Management issues with an innovative approach to settling medical malpractice cases designed to mitigate exposure or damages to doctors.

n.  She was one of the most published administrators in the country.

o.  She earned certification from the Fellow of the American College of Medical Practice Executives, which is a very difficult certification to earn.

p.  She spoke at national and international conferences.

q.  She was credited with success in holding off a reduction in the workers' compensation fee schedule, and, as part of this effort, testified for the Texas State Legislature for several hours.

r.  She wrote a lead Article in the *Journal of Bone and Joint Surgery*, showing that, at the time, practice patterns did not change after physician ownership. This was considered to be an incredibly important peer reviewed paper in an academic journal discussing the topic of physician owned specialty hospitals.

s.  She responded to all Texas Medical Board complaints against FOG doctors, and avoided disciplinary action in every case.

t.  She successfully ran and oversaw the FOG group and its eventual approximately 375 employees on a day-to-day basis.

Under Pierce's leadership, FOG grew into an approximately $60 million per year business with approximately 45 physician partners, of which approximately 21 were also

partners in FOLTD (the entity that is 40% owner of TOH).  The physician partners earned millions of dollars per year, through their individual practices and (in the case of approximately 21 of them), their individual partnership interests in FOLTD.

In September 2017, Pierce was named CEO of FOG.  Her job remained the same; that was merely a change in job title.  At the time – which is less than a year ago – FOG's then President and Managing Partner, Dr. Jeffrey Kozak, publicly proclaimed that, "Peggy Pierce has been the guiding force in the success of both Fondren Orthopedic Group and Texas Orthopedic Hospital.  Her commitment to excellence is unparalleled." *Fondren Orthopedic Group Names New CEO*, Houston Chronicle, September 12, 2017 (Ex. 1-A).

Around the same time, other FOG physicians wrote glowing notes of appreciation to Pierce.  Dr. Muffadel Gombera wrote a note stating, in part, "[w]hen I ask the partners about strategies that helped Fondren become so successful, I always get one answer: "Peggy.'" (Ex. 1-B).  Dr. Greg Stock wrote a note stating that Pierce, "is the person that I most appreciate when I receive a distribution check.  I am confident she has done everything possible to make the distributions as big and fair as possible." (Ex. 1-C).

**B.      Pierce Had An Approximately $630,000 Per Year Compensation Package; In Addition, In 2014, FOLTD Agreed To Pay Her Approximately $300,000.00 Per Year For Five Years After Her Employment With FOG Ended**

In 2005, FOLTD began paying Pierce the equivalent of 10 unit shares from FOLTD's quarterly partnership earnings.  This was done to reward Pierce for her hard work and efforts regarding the efficiency and financially successful operations of TOH and the day-to-day operations of FOLTD.  As FOLTD's General Partner's President at the time, G. William Woods, M.D., wrote at the time:

> It has been decided that it is definitely time to properly reward you for all of your hard work and efforts regarding the efficient and financially successful operations of Texas Orthopedic Hospital and the day-to-day operations of Fondren

Orthopedic Ltd. Therefore, effective with the regular earnings distribution for the second quarter of 2005, which was due July 15th, you are to pay yourself an amount equal to what 10 Units of Partnership Ownership Interest would receive.

* * *

You have done an excellent job for the Partnership and you deserve to share in its rewards.

(Ex. 1-D).

Pierce's outstanding performance continued over the next nine years, and FOG, FOLTD, and TOH continued to thrive, prosper, and grow. Accordingly, on November 14, 2014, FOLTD agreed in writing to continue to pay Pierce, among other things, the equivalent of 10 unit shares from FOLTD's quarterly partnership earnings during the rest of her employment with FOG, and for five years after her termination. *See* "the Agreement," (Ex. 1-E). The Agreement is predicated on Pierce continuing to be FOG's Administrator and handling the day-to-day business Affairs of the Partnership – both of which she did over the following 3+ years of her employment at FOG (*Id.*). The Agreement does not condition Pierce's right to such payment for five years after her termination on her being terminated without cause. The Agreement is not discretionary – it says that Pierce "will" received such payments (*Id.*). The Agreement was conceived of, initiated by, and executed on behalf of FOLTD by Dr. Woods, who was still the President. Dr. Woods had both apparent and actual authority to execute the Agreement on behalf of FOLTD. Dr. Woods also intencentivized Pierce to continue her excellent performance on behalf of FOLTD, because the more FOLTD earned, the more her quarterly payments would be, both while she was working on behalf of FOLTD, and for five years after her termination (Ex. 1-E at 2). Over the years, the quarterly distributions averaged a total of approximately a total of $300,000.00 a year.

Pierce's annual total compensation package from FOG and FOLTD, including the equivalent of 10 unit shares distributions, was approximately $630,000.00 per year.   In the summer of 2017, Dr. Woods left FOG and FOLTD (he was voted out) after approximately 30 years at the helm, and was replaced by Dr. Kozak.  Dr. Kozak was replaced by Dr. Stocks in February 2018 and Dr. Stocks was replaced by Dr. Elkousy a few months later.

**C.     Pierce Objected To FOG's Unethical Practices; In Response, FOG Illegally Removed Pierce From The Workplace And Placed Her On An "Indefinite Leave" Based On Her Disability, Age, And Sex**

Pierce dyes her hair blond.  Around the same time that she was promoted to CEO in 2017, she told Dr. Kozak that she was thinking of letting her hair grow out into its natural color, which is white.  Dr. Kozak told her that there was talk in the doctors' lounge about them not wanting an older woman as CEO, and that letting her hair grow out white would feed that age/sex talk, and being an older woman is not a good position to be in.  Dr. Kozak told Pierce that was not fair, but it was reality.  Consistent with what Dr. Kozak told her, physicians at FOG and FOLTD have stated in partnership meetings that they wanted to hire younger people.

Shortly after Pierce was named CEO, Dr. Kozak and other of FOG's and FOLTD's physician partners, began an intense campaign to increase revenues by engaging in myriad unethical practices, such as systematically prescribing the use of durable medical equipment ("DME") equipment to patients without medical necessity, and submitting deceptive paperwork to insurers and other payors in order to conceal the scheme.  Pierce objected to this and other unethical practices on numerous occasions, both verbally and in writing.  Her objections were ignored by FOG's then President and Managing Partner, Dr. Kozak, FOG's then Vice President, Dr. Hussein Elkousy, and other physician partners, and the objectionable practices continued.

Pierce ran a report comparing the number of DME devices that Defendants had prescribed in January 2017, as compared to January 2018.  The difference was staggering – the

7

amount of DME prescriptions had increased at least 10-fold or more.  This confirmed that the Defendants were engaged in nothing more than a fraudulent naked money grab at the expense of their patients, insurance companies, and other payors.  When Pierce continued to object, the physicians involved in this scheme made comments such as "the insurance companies have been screwing us for years; it is our turn to screw them."

Immediately after Pierce voiced her objections to the unethical practices concerning, for example, the DME over-prescription, she was attacked by FOG's and FOLTD's physicians.  A particularly noteworthy attack was premised on her having MS.  Pierce has had MS for many years.  She manages it with daily medication and exercise.  It has never adversely affected her job performance.  Yet, on January 24, 2018, Dr. Kozak and Dr. Elkousy – two of the chief architects of the scheme – both told Pierce that they believed her MS was affecting her appearance and that she embarrassed them and the group during a recent conference in Austin, Texas, by appearing fatigued.  Dr. Elkousy said that he believed that Pierce's MS had caused a 30% cognitive impairment and that it had for many years.  Pierce assured them both that her MRI results had not shown any worsening in the lesions that cause the MS, and offered to undergo full physical and cognitive testing, and share the results with them.  They declined.  Dr. Elkousy then said that he believed Pierce's MS has resulted in millions of dollars being left on the table or in millions of dollars of mistakes being made.  When asked for an example, Dr. Elkousy could not provide even one, instead nonsensically stating that, "we don't know what we don't know."  Dr. Kozak and Dr. Elkousy brought up Pierce's MS at least twenty times during the meeting, and clearly communicated to Pierce that they perceived her MS as substantially limiting her ability to think or to perform her job, despite admittedly having no evidence that her MS ever adversely impacted her thinking or her job performance even one time.

Indeed, Pierce's performance was outstanding, and the objective results prove that.   For example:

    a.    The last quarter of 2017 was FOLTD's best quarter financially in its 23-year history.

    b.    The month of January 2018, was one of FOG's best months financially in its 43-year history.

    c.    Pierce had successfully recruited six new physicians to FOG in the last six months, two of whom bought into FOLTD for $4 million each, which resulted in each of the approximately 21 FOLTD partner physicians (other than one) receiving over $400,000.00, in addition to the approximately $1.5 million each physician receives annually in earnings distributions from FOLTD, and their practice incomes from FOG of six or seven figures each.

    d.    In late 2017, Pierce put together a presentation by doctor concerning revenues, and sliced and diced the data in every way possible that she could come up with, and that Dr. Kozak and Dr. Elkousy, could think of.   Pierce fully answered hours of questions until there were no more.   There are saved minutes of the presentation.

On or about February 7 and 8, 2018, two weeks after Dr. Kozak and Dr. Elkousy attacked Pierce for having MS, Pierce, in her capacity as CEO, asked FOG's IT consultant, Wes Spears, to copy her emails and files on her computer, and her electronic calendar, so as to ensure relevant information concerning FOG's and FOLTD's aforementioned unethical and potentially illegal practices was maintained.  This was her right and duty as CEO.  It was also a federally protected right under 18 U.S.C. § 1833(b) of the Defend Trade Secrets Act of 2016.  Pierce instructed Mr. Spears not to tell anyone what she had asked him to do, and to invoice his work so as not to reveal what he was asked to do, because she reasonably feared that if Drs. Elkousy and Kozak found out that she was making efforts to retain evidence of FOG's and FOLTD's aforementioned unethical and potentially illegal practices, they would fire her, and bury the evidence of their wrongdoing, and of her objections (Ex. 1-F).

Unbeknownst to Pierce, Dr. Elkousy had tellingly instructed Mr. Spears to let him know if Pierce asked him to copy any electronic files (which, he knew, contained the proof of FOG's and FOLTD's wrongdoing, and of Pierce's objections).   After Mr. Spears informed him of Pierce's request, Dr. Elkousy and Dr. Kozak had Pierce removed from the workplace on February 8, 2018, by an armed security guard.  In a text message Dr. Kozak inadvertently sent Pierce that day, he wrote that he was "terminating her with an escort." (Ex. 1-G).   Yet, in contrast, Dr. Elkousy told Pierce she was on a paid leave of absence.

**D.    Dr. Elkousy Essentially Admitted That FOG's Given Reason For Removing Pierce From The Workplace And Placing Her On An "Indefinite Leave" Was A Pretext**

Three days later, on Sunday, February 11, 2018, Dr. Elkousy reiterated in a phone call with Pierce that she was on a paid leave of absence.  Dr. Elkousy also admitted that she had the right to have the files copied by the IT person.   In other words, Dr. Elkousy essentially admitted that the articulated basis for "terminating her with an escort" was an indefensible pretext.

That same day, February 11, 2018, Dr. Kozak sent an e-mail out to the physician partners falsely claiming that Pierce "is taking an indefinite leave of absence . . . ." (Ex. 1-H).   Dr. Kozak's email does not accuse Pierce of any wrongdoing (*Id.*).   To the contrary, Dr. Kozak's email states that, "Peggy has had many accomplishments during her 30-year career with Fondren, all of which are greatly appreciated." (*Id.*). Yet, Pierce remained banned from the workplace.

**E.    Pierce Alleged Illegal Discrimination, And Defendants Hired A Law Firm To Investigate Her Allegations While She Remained On The Indefinite Leave**

On February 14, 2018, Pierce complained of unlawful discrimination that violated the TCHRA.  On February 23, 2018, FOG's and FOLTD's then outside counsel, Ruth Ann Daniels, of Gray Reed & McGraw LLP, sent Pierce's lawyer a letter stating, in relevant part, "[a]t the outset, we would like to clarify that Pierce has not been terminated.  Pierce has been placed on a

10

paid leave of absence while an investigation is conducted." (Ex. 1-I).  Daniels' letter stated that she had "begun an investigation into Pierce's allegations of discrimination and unethical conduct." (*Id.*).  Daniels asked for a date to meet with Pierce, to interview her (*Id.*).  Pierce agreed to meet on February 27, 2018.

On February 27, 2018, Ruth Ann Daniels interviewed Pierce in person as Pierce's lawyer's office.  The interview was audio recorded at Daniels' request (Ex. 1-J).  Daniels asked Pierce questions about her allegations of disability, sex, and age discrimination (*Id.*).  Daniels did not accuse Pierce of any financial or other wrongdoing during her interview (*Id.*).  Daniels had no further contact with Pierce after her interview on February 27, 2018.

**F.** **While She Remained On Her "Indefinite Leave," Pierce Filed An EEOC/TWC-CRD Charge Of Discrimination, And Sent A Copy Of The Charge To Defendants' Lawyer**

On February 28, 2018, Pierce filed a Charge of Discrimination with the Texas Workforce Commission – Civil Rights Division ("TWC-CRD") and the Equal Employment Opportunity Commission ("EEOC"), and her lawyer sent a copy to Ms. Daniels that same day (Ex. 1-K).

Presumably, Daniels reported back to FOG and FOLTD about her interview with Pierce, and whether she found her allegations credible.  She presumably also passed along the TWC-CRD/EEOC Charge, and provided her opinion on that too.  Shortly after the interview, FOG and FOLTD terminated Gray Reed & McGraw LLP and Daniels as their legal counsel in this matter.

**G.** **Two Weeks After She Filed Her EEOC/TWC-CRD, FOG Fired Pierce, But Did Not Allege That It Had Fired Her For Cause, Or For Any Particular Alleged Wrongdoing – In Fact, It Thanked Pierce For Her Service And Wished Her The Best In Her Future Endeavors**

Two weeks later, on March 15, 2018, FOG formally terminated Pierce's employment via a letter sent to her house (Ex. 1-L).  The letter did not state a reason for her termination.  Nor did it claim that Pierce was terminated for cause, or even accuse Pierce of any wrongdoing.  Rather,

the letter stated, "[t]hank you for your service to FOG and we wish you the best in your future endeavors." (*Id.*). Pierce was replaced as CEO by a far less qualified non-disabled male, Jeff Stocks (the brother of one of the partner physicians). On March 22, 2018, Pierce timely filed an amended EEOC/TWC-CRD Charge to include her formal termination (Ex. 1-M).

**H.    Defendants Fired Their First Law Firm, And Hired A New Law Firm**

At some point after terminating Gray Reed & McGraw LLP and Daniels as their legal counsel in this matter, Defendants hired Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C. ("AZA"). On Monday, April 16, 2018, the parties mediated this matter, pre-suit, in front of mediator Alan Levin. The case did not settle. That same day, FOLTD's payment for the full first quarter of 2018 was due to Pierce pursuant to the plain terms of the Agreement (Ex. 1-E). FOLTD refused to make the payment due to her, and thus breached the Agreement.

**I.    Defendants Then Belatedly Claimed That They Fired Pierce For Cause, In A Desperate Attempt To Get Out Of Paying Pierce Approximately $1.5 Million Under The Agreement It Entered With Her In November 2014**

Two days later, on April 18, 2018, a lawyer from the Defendants' new law firm sent Pierce a letter through her counsel (Ex. 1-N). By this time, more than two months has passed since Defendants had removed Pierce from the workplace and placed her on an "indefinite leave," and more than a month had passed since Defendants had formally terminated Pierce (Exs. 1-H and 1-L). Up until this time, Defendants had never alleged that Pierce was terminated for "cause," or for any specified alleged wrongdoing (Exs. 1-H and 1-L).

Yet, in this *post hoc* letter from their new lawyers, Defendants now claimed – for the first time – that Pierce had been fired for cause, and conveniently enough, according to them that meant that they owed Pierce nothing (Ex. 1-N). Defendants thus claim that they are not obligated to honor the terms of the Agreement (*Id.*), even though the Agreement expressly provides that FOLTD is obligated to pay Pierce distributions the equivalent to 10 unit shares

from FOLTD's quarterly partnership earnings <u>for five years after her termination</u>, and contains no exception for termination for "cause" (not to mention that Pierce was not terminated for "cause" anyway) (Ex. 1-E).   In the letter, Defendants asserted five different actions Pierce allegedly took that constituted "cause" for her termination (Ex. 1-N).   As explained in detail in her attached affidavit (Ex. 1), Defendants' after-the-fact manufactured assertions of wrongdoing against Pierce are without any merit.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in a light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).   Initially, the movant bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the nonmovant will be unable to establish a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

## IV.   ARGUMENT AND ANALYSIS

### A.   Legal Standards

A breach of contract claim has the following elements:   (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Wright v.*

*Christian & Smith*, 950 S.W.2d 411, 412 (Tex. App. – Houston [1st Dist.] 1997, no writ).  There is no question that all four elements are satisfied in this case.  *See supra*.

In interpreting a contract's meaning, if the words of a contract can be given a definite meaning, the contract is unambiguous and should be construed as a matter of law. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). The Court construes an unambiguous contract as a matter of law.  *See Transcon. Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 665 (Tex. App. – Houston [1st Dist.] 2000, pet. denied) (holding that "[i]f the contract is unambiguous, the court must enforce the contract as written").  An unambiguous contract will be enforced as written, and parole evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports.  *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008).

### B.    Analysis

As set forth below, FOLTD makes two arguments in an effort to evade Pierce's breach of contract claims.  Neither argument has thwarts Pierce's entitled to summary judgment.

### 1.    The Agreement Is Supported By Consideration

FOLTD first asserts that the Agreement is not supported by consideration (Defendants' Original Answer and Counterclaim, Doc. 8 at ¶ 45).  FOLTD is wrong as a matter of law.  It is well-settled in Texas that consideration may take the form of a benefit to the promissor or a detriment to the promisee. *See Diamond Paint Co. of Houston v. Embry*, 525 S.W.2d 529, 533 (Tex. Civ. App. – Houston (14th Dist.) 1975, writ refused n.r.e.). The burden of proving a lack of consideration is on the pleader. *Winters v. Langdeau*, 360 S.W.2d 515, 516 (Tex. 1962). "It is a rebuttable statutory presumption that a written instrument is *prima facie* proof of consideration." *Richardson v. Office Bldgs. of Houston*, 704 S.W.2d 373, 375 (Tex. App. – Houston [14th] Dist. 1985, no writ).  FOLTD cannot carry its burden.

14

Here, there is a specific written agreement (Ex. 1-E).  Its intent was to both reward Pierce for her past efforts, and to incentive her to continue to perform outstanding work for FOLTD, because the more money FOLTD made, and the more successful it became in the future, the larger her quarterly distributions would be going forward, and for the five years after her termination.  Indeed, the Agreement was expressly predicated on Pierce continuing to be the FOG Administrator and handling the day-to-day business Affairs of the Partnership (Ex. 1-E).  Pierce subsequently performed by continuing to be the FOG Administrator and handling the day-to-day business Affairs of the Partnership.  This is thus a valid and enforceable contract. *See Vanegas v. American Energy Services*, 302 S.W.3d 299, 303-04 (Tex. 2009) (based on their performance, the employees' right to payment under a previous unilaterally offered bonus agreement vested, and employer could not deny payment); *Pasant v. Jackson Nat'l Life Ins. Co.*, 52 F.3d 94, 96 (5th Cir. 1995) ("Even if part of A.J. Pasant's motivations was a reward J. Pasant for past services, a promise that is supported by a mixture of gift and bargain is supported by adequate consideration."); *Toch v. Eric Schuster Corp.*, 490 S.W.2d 618, 624 (Tex. Civ. App. – Dallas 1972, writ ref'd n.r.e.).  This conclusion is bolstered by the fact that the Agreement is non-discretionary – it says that Pierce "will" received such payments.  *Cf. City of Houston v. Williams*, 353 S.W.3d 128, 138 (Tex. 2011) (holding that language in statute that firefighters "shall" be entitled to, and "shall" receive specific benefits was binding and established entitlement to those benefits).  In sum, the Agreement is supported by consideration and  is enforceable under Texas law.

## 2. There Is No Exception In The Agreement For A Termination For Cause (And Pierce Was Not Terminated For Cause Anyway)

FOLTD's second argument is that it did not breach the Agreement, because Pierce was terminated for "cause."  Even if Pierce was terminated for "cause" (and she was not), that would

not be sufficient for FOLTD to avoid summary judgment because the plain and unambiguous language of the Agreement does not excuse FOLTD from performance if Pierce is terminated for "cause." (Ex. 1-E).   The Agreement does not even mention "cause," as any basis for excusing performance by FOLTD.  Rather, the Agreement unambiguously provides that FOLTD must pay Pierce the equivalent of 10 unit shares from FOLTD's quarterly partnership earnings during the rest of her employment with FOG, and for five years after her termination.  There is no exception if Pierce is terminated for cause.  Accordingly, as a matter of law, Pierce is entitled to: (1) her full final quarterly distribution for the first quarter of 2018 (which would have been approximately $63,139.32); and (2) the equivalent of 10 unit shares from FOLTD's quarterly partnership earnings for five years after her termination, *i.e.*, until the end of March 2023.

This interpretation is mandated by the plain language of the Agreement. It is also completely consistent with the main purpose of the Agreement – to ensure Pierce was compensated after her employment with FOLTD ended.   As Dr. Woods explained in the Agreement itself:

> You have done an excellent job for the Partnership and after these many years of dedicated service deserve not only to continue sharing in the success of the Partnership, **but to benefit past the point when you are no longer working for Fondren and the Partnership**.

(Ex. 1-E at 2) (bold added).

To try to support its articulated defense that a termination for "cause" would excuse its performance under the Agreement, FOLTD has cited to one unpublished Texas case, *Gorbet v. Northwood Lincoln-Mercury*, No. 14-04-00813-CV, 2005 WL 2875283 (Tex. App. – Houston [14th Dist.] 2005, writ denied) (unpublished) (Defendants' Original Answer and Counterclaim, Doc. 8 at ¶ 47).   *Gorbet* is not on point.   In *Gorbet*, a newly hired employee, Gorbet, and Northwood entered into an employment contract, which contained the following clause:

16

> If the terms and conditions of this "Employment Contract" are agreed by the signatures below, Northwood additionally agrees, in the event Mike [Gorbet] is terminated, or laid off within 12 months of the initial employment date of 01/08/02 Northwood will honor this contract by paying in full all remaining months to equal 12 full months of employment and employment pay at the time of termination or lay off.

Northwood discharged Gorbet in July 2002, after Gorbet was involved in a physical altercation while attending an auto auction on behalf of Northwood.  It refused to pay him the remainder of his twelve month contract.  Gorbet sued, and the trial court granted summary judgment for Northwood.  The Court of Appeals affirmed on the ground that a term employment contract may be terminated for "cause" without further liability, and Northwood had proven that it terminated Gorbet for "cause."  *Id*. at *2.

*Gorbet* does not govern here for at least three separate and independent reasons.  First, the rule in *Gorbet* applies to term employment contracts.  Here, the Agreement is not a term employment contract – indeed, it is not a contract of employment at all (Ex. 1-E).  Second, *Gorbet* did not deal with a situation where, as is the case here, an employer specifically explicitly promised to make payments to an employee after her termination.  Third, *Gorbet* did not deal with an situation where, as is the case here, an employer specifically stated that its intent for entering the Agreement was so as to ensure that the long-term employee continued to share in the success of a partnership after their employment ended specifically because of the "excellent job" she had done to make the partnership successful (Ex. 1-E at 2).  For all three reasons, *Gorbet* is not controlling, and does not excuse FOLTD's breaches of the Agreement in this case.

Alternatively, even if *Gorbet* did apply (and it does not), it would not excuse FOLTD's breaches of the Agreement because FOG's own contemporaneous communications to Pierce at the time of her termination demonstrate that FOG did not terminate Pierce for "cause."  Instead, when FOG formally terminated Pierce's employment on March 15, 2018, it sent her a

17

termination letter that did not even state a reason for her termination (Ex. 1-L). FOG did not claim in the termination letter that Pierce was terminated for cause, or even accuse Pierce of any wrongdoing. Rather, the termination letter stated, "[t]hank you for your service to FOG and we wish you the best in your future endeavors." (*Id*.). It was only (much) later, after a failed mediation, through its new legal counsel, that FOG took the positon that Pierce had been terminated for cause (Ex. 1-N). Thus, the fact remains that, at the legally relevant time – the time of her termination – not even FOG or FOLTD claimed Pierce was being terminated for cause. As such, even if *Gorbet* did otherwise apply – and it does not – it would not excuse FOLTD's breaches of the Agreement.

## V.   CONCLUSION

As set forth herein, Pierce respectfully prays that the Court grant her motion for partial summary judgment on two of her breach of contract claims. A proposed Order is filed contemporaneously with this motion.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:   s/ Mark J. Oberti
Mark J. Oberti
State Bar No. 00789951
S.D. Texas No. 17918
712 Main Street, Suite 900
Houston, Texas 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
mark@osattorneys.com – Email

ATTORNEY-IN-CHARGE FOR PLAINTIFF

18

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon the counsel of record listed below by the Southern District of Texas ECF method on the 25th of June 2018.

Joseph Ahmad
AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING, P.C.
1221 McKinney, Suite 2500
Houston, Texas 77010

s/ Mark J. Oberti
Mark J. Oberti

**INDEX OF EXHIBITS**

| DESCRIPTION OF EXHIBITS TO PIERCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON TWO OF HER BREACH OF CONTRACT CLAIMS | EXHIBIT |
|---|---|
| Affidavit of Peggy Pierce | 1 |
| Houston Chronicle Article Announcing Peggy Pierce as FOG's CEO in September 2017 | 1-A |
| Letter from Mufaddal Gombera, M.D. to Peggy Pierce of August 22, 2017 | 1-B |
| Letter Regarding Peggy Pierce from Greg Stocks, M.D. | 1-C |
| Letter from G. William Woods, M.D. to Peggy Pierce of July 20, 2005 | 1-D |
| November 10, 2014 Agreement with Peggy Pierce | 1-E |
| Peggy Pierce Text Message to Wes Spears | 1-F |
| Text Message from Jeffrey Kozak, M.D. Concerning Peggy Pierce | 1-G |
| E-mail from Jeffrey Kozak M.D. of February 11, 2018, Announcing Peggy Pierce Was On An Indefinite Leave | 1-H |
| Letter from Ruth Ann Daniels to Mark J. Oberti of February 23, 2018 | 1-I |
| Transcript of Ruth Ann Daniels' Interview of Peggy Pierce on February 27, 2018 | 1-J |
| E-mail from Mark Oberti to Ruth Ann Daniels with File-Stamped EEOC/TWC-CRD Charge Attached, Dated February 28, 2018 | 1-K |
| Termination Letter to Peggy Pierce of March 15, 2018 | 1-L |
| Amended File-Stamped EEOC/TWC-CRD Charge of March 22, 2018 | 1-M |
| E-mail from AZA Law Firm with Letter Attached of April 18, 2018 | 1-N |
| Amended and Restated Limited Partnership Agreement Of Fondren Orthopedic LTD.  (A Texas Limited Partnership) | 1-O |